## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

STUART WELLS, derivatively on behalf of SPECTRUM PHARMACEUTICALS, INC.,

    Plaintiff,

vs.

RAJESH C. SHROTRIYA, JOSEPH W. TURGEON, KURT A. GUSTAFSON, LEE F. ALLEN, LUIGI LENAZ, GILLES R. GAGNON, STUART M. KRASSNER, ANTHONY E. MAIDA, RAYMOND W. COHEN, and DOLATRAI VYAS,

    Defendants,

    and

SPECTRUM PHARMACEUTICALS, INC.,

    Nominal Defendant.

**C.A. No. _____**


**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Stuart Wells ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Rajesh C. Shrotriya, Joseph W. Turgeon, Kurt A. Gustafson, Lee F. Allen, Luigi Lenaz, Gilles R. Gagnon, Stuart M. Krassner, Anthony E. Maida, Raymond W. Cohen, and Dolatrai Vyas (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Spectrum, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(A) of the Securities Exchange Act of 1934 (the "Exchange Act").

As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Spectrum, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Spectrum's directors and officers starting on March 13, 2015 and through the present (the "Relevant Period").

2.     Spectrum is a biotechnology company with a primary strategy comprised of acquiring, developing, and commercializing a broad and diverse pipeline of late-stage clinical and commercial products. One of the Company's products in late stage development is Apaziquone, also known as EOquin and Qapzola. Apaziquone is being developed for the treatment of non-muscle invasive bladder cancer ("NMIBC"), about which the Company claimed there was a significant unmet medical need.

3.     In 2007, the Company initiated two placebo-controlled, single-dose Phase 3 studies for Apaziquone, the 611 Study and the 612 Study. The endpoint for both of the two studies was a 2-year recurrence rate. The original statistical analysis plans ("SAP") for Study 611 and Study 612, which described the planned statistical analysis of the two clinical studies, were reviewed and approved by the FDA, respectfully, in April 2009 and November 2008.

4.     The SAPs were amended both prior to and after the completion of the studies.

5.     Spectrum completed the two Phase 3 clinical studies of Apaziquone and met with the Food and Drug Administration ("FDA") to discuss the results in December 2012. In this meeting, regulators told Spectrum that each of the Company's Studies 611 and 612 "failed to meet the primary endpoint," and the Company should "NOT" submit a New Drug Application ("NDA") based on the data from these two studies.

6.     In December 2015, defying the FDA's advice, the Individual Defendants caused Spectrum to submit an NDA for Apaziquone based on what the FDA referred to as a "post-hoc" analysis of pooled data from Studies 611 and 612 that was not part of the approved SAPs. Indeed, the FDA-approved SAPs never contained a plan for pooling the data of Studies 611 and 612.

7.     Moreover, during the Relevant Period, the Individual Defendants personally made, or caused the Company to make a series of materially false and misleading statements regarding the FDA's guidance, the results of the Company's 611 and 612 Studies, the Company's post-hoc analysis of integrated data from those two studies, and the approval prospects of the Apaziquone NDA. Specifically, the Individual Defendants failed to disclose and/or caused the Company to fail to disclose that: 1) both of the Company's 611 and 612 Studies did not meet the pre-specified criteria for superiority when compared to a placebo; 2) the FDA previously questioned whether the data from the Company's 611 and 612 Studies was clinically meaningful; 3) the Company's pooled analysis of the integrated data from these two studies was done post-hoc and was not part of the approved SAPs; and 4) the FDA advised the Company not to submit the NDA for Apaziquone based on data from the 611 and 612 Studies.

8.      On February 19, 2016, the Company announced that the FDA had accepted the Apaziquone NDA for review. The Company further indicated that the FDA planned to hold an Oncologic Drugs Advisory Committee ("ODAC") meeting to discuss the NDA and had set a target action date for deciding on the NDA under the Prescription Drug User Fee Act ("PDUFA") of December 11, 2016.

9.      On September 14, 2016, the FDA published on its website a briefing document containing background information prepared for the members of the ODAC before the ODAC meeting, in which it revealed that, back in December 2012, the FDA had already discouraged Spectrum from submitting an NDA based on data from the 611 and 612 Studies and had questioned whether the data was clinically meaningful. The FDA also noted that the Company's "pooled analysis, using data from both studies, was done post-hoc and was not part of the statistical plan."

10.     Unsurprisingly, the same day, the ODAC voted against Apaziquone unanimously (14-0) because Apaziquone "has not shown substantial evidence of a treatment effect over placebo."

11.     On this news, shares of Spectrum fell sharply from its previous closing price of $5.49 per share to trade as low as $4.69 per share on September 14, 2016 and eventually closed at $5.04 per share that day.

12.     Thereafter, two articles were published about the Company, criticizing the Company for failing to be transparent about their communications with the FDA and raising concerns about the Company's management. One article published on September 19, 2016 commented that the management of Spectrum was "not trustworthy."

13.     On this news, Spectrum's share price fell $0.32 per share or 6.3% over five days to close at $4.72 per share on September 19, 2016.

14.     Finally, on November 17, 2016, the Company announced that it had "received a Complete Response Letter ("CRL") from the [FDA]," communicating the FDA's decision to reject the Apaziquone NDA.

15.     In light of the Individual Defendants' misconduct, which has subjected Spectrum and its Chief Executive Officer ("CEO"), its Chairman and Chief Financial Officer ("CFO"), its President, and its former Chief Medical Officer to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the District of Nevada (the "Securities Class Actions"),[1] the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, including through insider transactions, the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Chairman-CEO Defendant Shrotriya's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationship with each other, and their not being disinterested and/or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[1] One of the two Securities Class Actions only names as defendants the Company and its CEO-Chairman.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the federal securities class action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this district because Spectrum is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Spectrum.  Plaintiff has continuously held Spectrum common stock since before the beginning of the Relevant Period.

### Nominal Defendant Spectrum

22.     Spectrum is a Delaware corporation with its principal executive offices at 11500 South Eastern Avenue, Suite 240, Henderson, Nevada 89052. Spectrum's shares trade on the NASDAQ under the ticker symbol "SPPI."

### Defendant Shrotriya

23.     Defendant Rajesh C. Shrotriya ("Shrotriya") has served as the Company's Chairman of the Board and CEO since August 2002 and as a director since June 2001. From

September 2000 to April 2014, he also served as the Company's President. Defendant Shrotriya is the Chair of the Placement Committee and the Product Acquisition Committee. According to the Company's Schedule 14A filed with the SEC on April 29, 2016 (the "2016 Proxy Statement"), as of April 29, 2016, Defendant Shrotriya beneficially owned about 8.8 million shares of the Company's common stock, which was about 11.67% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Shrotriya owned about $62.5 million worth of Spectrum stock.

24.     For the fiscal year ended December 31, 2015, Defendant Shrotriya received $4,422,565 in compensation from the Company.  This included $945,000 in salary, $945,000 in bonus, $723,000 in stock awards, $1,555,962 in option awards and $253,603 in other compensation.

25.     As disclosed in the 2016 Proxy Statement, Defendant Shrotriya's 2015 target bonus opportunities were set at 100% of salary and he received the full targeted amount. The cash bonus awarded to Defendant Shrotriya in 2015 was determined by the Compensation Committee in March 2016 based on an assessment of a number of financial and strategic objectives, including the development and regulatory goals with respect to Apaziquone. In determining the stock awards and option awards to grant to Defendant Shrotriya in 2015, the Compensation Committee also took into account the Company's performance with respect to the pre-established objectives, including those associated with Apaziquone's regulatory advancement.

26.     The Company also disclosed in the 2016 Proxy Statement that Defendant Shrotriya is not considered an independent director under the NASDAQ listing rules.

Verified Shareholder Derivative Complaint

27.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Shrotriya made the following dispositions of Company stock.  On December 22, 2015, Defendant Shrotriya disposed 93,617 shares of Company stock for $5.84 per share.  On March 22, 2016, Defendant Shrotriya disposed 6,838 shares of Company stock for $6.08 per share.  Thus, in total, before the fraud was exposed, Defendant Shrotriya disposed 100,455 Company shares on inside information, from which he benefited in the amount of $588,298.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

28.     The Company's 2016 Proxy Statement stated the following about Defendant Shrotriya:

> Dr. Shrotriya has been Chairman of the Board and Chief Executive Officer since August 2002 and a director of Spectrum since June 2001. From September 2000 to April 2014, Dr. Shrotriya also served as President of Spectrum. From September 2000 to August 2002, Dr. Shrotriya also served as Chief Operating Officer of Spectrum. Prior to joining Spectrum, Dr. Shrotriya held the position of Executive Vice President and Chief Scientific Officer from November 1996 until August 2000, and as Senior Vice President and Special Assistant to the President from November 1996 until May 1997, for SuperGen, Inc., a publicly-held pharmaceutical company focused on drugs for life-threatening diseases, particularly cancer. From August 1994 to October 1996, Dr. Shrotriya held the positions of Vice President, Medical Affairs and Vice President, Chief Medical Officer of MGI Pharma, Inc., an oncology-focused biopharmaceutical company. Dr. Shrotriya spent 18 years at Bristol-Myers Squibb Company ("BMS"), an NYSE-listed pharmaceutical company, in a variety of positions, most recently as Executive Director, Worldwide CNS Clinical Research. Previously, Dr. Shrotriya held various positions at Hoechst Pharmaceuticals, most recently as Medical Advisor. Dr. Shrotriya was an attending physician and held a courtesy appointment at St. Joseph Hospital in Stamford, Connecticut. In addition, he received a certificate for Advanced Biomedical Research Management from Harvard University. Dr. Shrotriya received an M.D. from Grant Medical College, Bombay, India, in 1974; a D.T.C.D. (Post Graduate Diploma in Chest Diseases) from Delhi University, V.P. Chest Institute, Delhi, India, in 1971; an M.B.B.S. (Bachelor of Medicine and Bachelor of Surgery — equivalent to an M.D. in the U.S.) from the Armed Forces Medical College, Poona, India, in 1967; and a B.S.

in Chemistry from Agra University, Aligarh, India, in 1962. Currently, Dr. Shrotriya is a member of the Board of Directors of CASI Pharmaceuticals, Inc. (CASI), a NASDAQ-listed biopharmaceutical company, and on the Board of Trustees at the UNLV Foundation.

Dr. Shrotriya is a demonstrated leader in the biopharmaceutical industry. His significant leadership experience includes over ten years of serving as our Chairman and Chief Executive Officer. Dr. Shrotriya has held prior leadership roles in the biopharmaceutical industry including his positions as our President and Chief Operating Officer, as the executive vice president and chief scientific officer for a publicly-held pharmaceutical company, and 18 years of experience in various positions he held in BMS. Dr. Shrotriya's significant leadership experience in the biopharmaceutical sector, along with his experience as a physician and his expertise in drug development, makes his well-qualified to serve on our Board of Directors.

**Defendant Turgeon**

29.     Defendant Joseph W. Turgeon ("Turgeon") has served as the Company's President and Chief Operating Officer since April 2014 and previously served as Senior Vice President and Chief Commercial Officer from October 2012 to April 2014. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Turgeon beneficially owned about 698,385 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Turgeon owned about $5 million worth of Spectrum stock.

30.     For the fiscal year ended December 31, 2015, Defendant Turgeon received $2,762,684 in compensation from the Company.  This included $575,000 in salary, $345,000 in bonus, $361,500 in stock awards, $1,414,511 in option awards and $66,673 in other compensation.

31.     As disclosed in the 2016 Proxy Statement, Defendant Turgeon's 2015 target bonus opportunities were set at 60% of salary, and he received the full targeted amount. The cash bonus awarded to Defendant Turgeon in 2015 was determined by the Compensation Committee

in March 2016 based on an assessment of a number of financial and strategic objectives, including the development and regulatory goals with respect to Apaziquone. In determining the stock awards and option awards to grant to Defendant Turgeon in 2015, the Compensation Committee also took into account the Company's performance with respect to the pre-established objectives, including those associated with Apaziquone's regulatory advancement.

32.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Turgeon made the following dispositions of Company stock.   On April 17, 2015, Defendant Turgeon disposed 8,205 shares of Company stock for $6.09 per share.   On October 29, 2015, Defendant Turgeon disposed 1,710 shares of Company stock for $5.32 per share.   On December 3, 2015, Defendant Turgeon disposed 1,710 shares of Company stock for $5.8 per share. On February 18, 2016, Defendant Turgeon disposed 3,822 shares of Company stock for $4.55 per share. On April 17, 2016, Defendant Turgeon disposed 8,205 shares of Company stock for $7.38 per share. On October 29, 2016, Defendant Turgeon disposed 1,710 shares of Company stock for $3.67 per share. On December 3, 2016, Defendant Turgeon disposed 1,710 shares of Company stock for $4.00 per share. According to the Form 4s filed by Defendant Turgeon with the SEC, these dispositions were made to satisfy Defendant Turgeon's tax withholding obligations. Thus, in total, before the fraud was exposed, Defendant Turgeon disposed 27,072 Company shares on inside information, from which he benefited in the amount of $160,042.  His insider transactions made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

33.     The Company's 2016 Proxy Statement stated the following about Defendant Turgeon:

Mr. Turgeon has served as President and Chief Operating Officer since April 2014 and previously served as Senior Vice President and Chief Commercial Officer from October 2012 to April 2014. He brings more than 30 years of pharma sales experience, including various executive leadership roles at Amgen Inc. Prior to joining Spectrum, Mr. Turgeon spent 22 years at Amgen Inc. as Vice President of Sales where he built and led the sales organization across multiple areas, including oncology, inflammation and bone health. Under Mr. Turgeon's leadership, Amgen Oncology launched four new drugs and revenues rose from $2 billion to over $6 billion. Mr. Turgeon holds a Bachelor of Science in Microbiology and Economics from Jacksonville University.

### **Defendant Gustafson**

34.     Defendant Kurt A. Gustafson ("Gustafson") has served as the Company's CFO and Executive Vice President since June 2013. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Gustafson beneficially owned about 498,806 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Gustafson owned about $3.54 million worth of Spectrum stock.

35.     For the fiscal year ended December 31, 2015, Defendant Gustafson received $1,850,554 in compensation from the Company.  This included $470,000 in salary, $235,000 in bonus, $180,750 in stock awards, $848,706 in option awards and $116,098 in other compensation.

36.     As disclosed in the 2016 Proxy Statement, Defendant Gustafson's 2015 target bonus opportunities were set at 50% of salary, and he received the full targeted amount. The cash bonus awarded to Defendant Gustafson in 2015 was determined by the Compensation Committee in March 2016 based on an assessment of a number of financial and strategic objectives, including the development and regulatory goals with respect to Apaziquone. In determining the stock awards and option awards to grant to Defendant Turgeon in 2015, the Compensation Committee also took into account the Company's performance with respect to the

pre-established objectives, including those associated with Apaziquone's regulatory advancement.

37.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Gustafson made the following dispositions of Company stock.   On June 3, 2015, Defendant Gustafson disposed 10,067 shares of Company stock for $6.19 per share.   On February 18, 2016, Defendant Gustafson disposed 2,669 shares of Company stock for $4.55 per share.   On March 22, 2016, Defendant Gustafson disposed 3,010 shares of Company stock for $6.08 per share. On March 25, 2016, Defendant Gustafson disposed 1,525 shares of Company stock for $5.96 per share. On June 3, 2016, Defendant Gustafson disposed 10,040 shares of Company stock for $7.52 per share. According to the Form 4s filed by Defendant Gustafson with the SEC, these dispositions were made to satisfy Defendant Gustafson's tax withholding obligations. The shares disposed had been cancelled. Thus, in total, before the fraud was exposed, Defendant Gustafson disposed 27,311 Company shares on inside information, from which he benefited in the amount of $176,940.   His insider transactions made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

38.     The Company's 2016 Proxy Statement stated the following about Defendant Gustafson:

> Mr. Gustafson joined Spectrum in June 2013 as Executive Vice President and Chief Financial Officer. He brings more than 20 years of diverse experience in corporate finance, with 15 years in senior management roles leading the finance departments of multi-faceted, dynamic and growth oriented biopharmaceutical industry organizations. Prior to joining Spectrum, Mr. Gustafson served as Vice President and Chief Financial Officer at Halozyme Therapeutics, Inc., a publicly-traded biopharmaceutical company. Before joining Halozyme in 2009, Mr. Gustafson worked at Amgen for over 18 years, holding various positions in

finance including Treasurer, VP Finance and Chief Financial Officer of Amgen International based in Switzerland. Mr. Gustafson is currently a member of the Board of Directors of Xencor, Inc. (XNCR), a NASDAQ-listed clinical-stage biopharmaceutical company. Mr. Gustafson serves as Chair of Xencor's Audit Committee and is a Member of its Compensation Committee. Mr. Gustafson holds a Bachelor of Arts degree in Accounting from North Park University in Chicago and a Masters in Business Administration from University of California, Los Angeles.

**Defendant Allen**

39.     Defendant Lee F. Allen ("Allen") served as the Company's Senior Vice President and Chief Medical Officer from March 2013 to January 2016. According to the Company's Schedule 14A filed with the SEC on April 30, 2015 (the "2015 Proxy Statement"), as of April 30, 2015, Defendant Allen beneficially owned about 198,259 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 30, 2015 was $5.65, Allen owned about $1.12 million worth of Spectrum stock around the start of the Relevant Period. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Allen beneficially owned about 84,631 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Allen owned about $600,034 worth of Spectrum stock after he resigned.

40.     For the fiscal year ended December 31, 2015, Defendant Allen received $676,131 in compensation from the Company.  This included $460,000 in salary, $108,450 in stock awards, and $107,681 in other compensation.

41.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Allen made the following dispositions of Company stock.  On March 18, 2015, Defendant Allen disposed 3,049 shares of Company stock for $6.38 per share.  On March 25, 2015, Defendant Allen disposed

813 shares of Company stock for $6.13 per share.  On May 8, 2015, Defendant Allen disposed

2,033 shares of Company stock for $5.89 per share. According to the Form 4s filed by Defendant

Allen with the SEC, these dispositions were made to satisfy Defendant Allen's tax withholding

obligations. The shares disposed had been cancelled. Thus, in total, before the fraud was

exposed, Defendant Allen disposed 5,895 Company shares on inside information, from which he

benefited in the amount of $36,410.  His insider sales made with knowledge of material non-

public information before the material misstatements and omissions were exposed demonstrate

his motive in facilitating and participating in the scheme.

42.    The Company's 2015 Proxy Statement stated the following about Defendant

Allen:

> Dr. Allen has served as Senior Vice President and Chief Medical Officer since
> March 2013. He brings over 15 years of biotech and pharmaceutical experience,
> as well as over 10 years of extensive research experience with over 40 papers
> published. Prior to joining Spectrum, from August 2007 to March 2013, Dr. Allen
> served in varying capacities including Chief Medical Officer, Executive Vice
> President and Senior Vice President of AMAG Pharmaceuticals, Inc., a publicly-
> traded biopharmaceutical company, where he led the company's clinical
> development, medical affairs and regulatory activities. Before AMAG, Dr. Allen
> held senior leadership roles at Wyeth Pharmaceuticals, Inc., serving as Vice
> President of Clinical Research and Development for the Oncology Therapeutic
> Area and as the Cambridge Clinical Site Head. Dr. Allen received an M.D. and a
> Ph.D. from the University of Medicine and Dentistry of New Jersey.

**Defendant Lenaz**

43.    Defendant Luigi Lenaz ("Lenaz") has served as a director of Spectrum since June

2010. Defendant Lenaz served as Spectrum's Chief Scientific Officer from February 2005 to

June 2008 and as President of Spectrum's Oncology Division from 2000 to 2005. Since retiring

as Spectrum's Chief Scientific Officer in June 2008, Defendant Lenaz provided consulting

services to Spectrum from June 2008 to June 2010. Defendant Lenaz is a member of the

Compensation Committee, the Placement Committee, the Nominating and the Corporate

Governance Committee, and the Product Acquisition Committee. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Lenaz beneficially owned about 235,327 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Lenaz owned about $1.67 million worth of Spectrum stock.

44.     For the fiscal year ended December 31, 2015, Defendant Lenaz received $189,588 in compensation from the Company.  This included $57,500 in cash, $69,600 in stock awards, and $62,488 in option awards.

45.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Lenaz made the following dispositions of Company stock.  On July 7, 2015, Defendant Lenaz disposed 625 shares of Company stock for $6.96 per share.  On June 27, 2016, Defendant Lenaz disposed 625 shares of Company stock for $6.47 per share.  On June 28, 2016, Defendant Lenaz disposed 2,500 shares of Company stock for $6.33 per share. According to the Form 4s filed by Defendant Lenaz with the SEC, these dispositions were made to satisfy Defendant Lenaz's tax withholding obligations. The shares disposed had been cancelled. Thus, in total, before the fraud was exposed, Defendant Lenaz disposed 3,750 Company shares on inside information, from which he benefited in the amount of $24,219.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

46.     The Company's 2016 Proxy Statement stated the following about Defendant Lenaz:

Dr. Lenaz has been a director of Spectrum since June 2010. Dr. Lenaz served as Spectrum's Chief Scientific Officer from February 2005 to June 2008 and as

President of Spectrum's Oncology Division from 2000 to 2005. Since retiring as Spectrum's Chief Scientific Officer in June 2008, Dr. Lenaz provided consulting services to Spectrum from June 2008 to June 2010. From 1997 to 2000, Dr. Lenaz served as Senior Vice President of Clinical Research, Medical Affairs at SuperGen, Inc., a NASDAQ-listed pharmaceutical company dedicated to cancer drug development. From 1978 to 1997, Dr. Lenaz held several senior management positions with Bristol-Myers Squibb Company ("BMS"), a NYSE-listed pharmaceutical company, including Senior Vice President of Oncology Franchise Management from 1990 to 1997 and Director of Scientific Affairs, Anti-Cancer from 1985 to 1990. Dr. Lenaz is also a prominent researcher, having conducted research in the areas of pharmacology, experimental chemotherapy, histology, general physiology, and experimental therapeutics at various institutions for cancer research, including Roswell Park Memorial Institute, Memorial Sloan-Kettering Cancer Center and the National Cancer Institute in Milan. He is a member of several scientific societies, including the American Association for Cancer Research, American Association for Clinical Oncology, European Society for Medical Oncology, and International Association for the Study of Lung Cancer. Dr. Lenaz has served as a director of Pharmaco-Kinesis Corporation, a privately-held medical device company, since January 2009. Dr. Lenaz is a graduate of Liceo Scientifico A. Righi in Bologna, Italy and he received a medical degree from the University of Bologna Medical School in 1966.

Dr. Lenaz is a renowned and accomplished oncologist who brings to the Board of Directors over 35 years' experience in the pharmaceutical industry and a wealth of knowledge in the field of cancer drug development. Dr. Lenaz's qualifications to serve on the Board of Directors include his expertise in the development of cancer drugs, his tenure as our Chief Scientific Officer, as well as his subsequent consulting services for our Company, his significant management experience with BMS, and his prominent research in the field of oncology. As a result, Dr. Lenaz is well qualified to serve on our Board of Directors.

**Defendant Gagnon**

47.     Defendant Gilles R. Gagnon ("Gagnon") has served as a director of Spectrum since March 2012. From 2008 to 2015, he served as President of Spectrum Pharma Canada Inc., an affiliate of Spectrum. Defendant Gagnon is a member of the Placement Committee and the Product Acquisition Committee. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Gagnon beneficially owned about 132,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Gagnon owned about $939,425 worth of Spectrum stock.

48.     For the fiscal year ended December 31, 2015, Defendant Gagnon received $182,088 in compensation from the Company.  This included $50,000 in cash, $69,600 in stock awards, and $62,488 in option awards.

49.     The Company has disclosed in the 2016 Proxy Statement that Defendant Gagnon is not considered an independent director under the NASDAQ listing rules.

50.     The Company's 2016 Proxy Statement stated the following about Defendant Gagnon:

> Mr. Gagnon was appointed by the Board of Directors to serve as a director of Spectrum in March 2012. From 2008 to 2015, he served as President of Spectrum Pharma Canada Inc., an affiliate of Spectrum. Prior to joining Spectrum, Mr. Gagnon was the President and Chief Executive Officer of Æterna Zentaris (AEZS), a Nasdaq-listed biopharmaceutical company focused on oncology and endocrinology. Prior to this position, he served as Vice President, Corporate Development at Æterna Laboratories since 1999, became President and Chief Operating Officer in 2001 and then President and Chief Executive Officer in January 2003, following the acquisition of Zentaris from German-based Degussa AG in December 2002. Prior to joining Æterna Zentaris, he was Vice President, External Affairs for Novartis Pharma Canada Inc. from 1996 to 1999. Prior to that, from 1989 to 1996, Mr. Gagnon held various positions including Executive Director, Corporate Planning and Business Development, Senior Director, Strategic Alliances, General Manager, Governments Affairs and Access to Market and Director of Professional Services at Sandoz Pharmaceuticals Inc. Throughout his career in the pharmaceutical industry, Mr. Gagnon was especially involved in corporate development, alliance management, as well as marketing functions where he participated in the launch of nine innovative pharmaceutical products, in addition to his general management functions.
>
> Mr. Gagnon has also participated in several international committees and strategic advisory boards. Mr. Gagnon serves on the board of directors of Canada's Research-Based Pharmaceutical Companies ("Rx&D") where he represents members from the biopharmaceutical sector and pioneered the Rx&D's biopartnering initiative. He recently completed his mandate as Chairman of the Board of BioQuebec and as a Director of Montreal In Vivo. He is currently a member of the board of directors of Spectrum Pharma Canada Inc. and serves as director, President and CEO of Ceapro Inc., a Canadian growth-stage biotechnology company whose primary business activities relate to the development and commercialization of active ingredients for pharmaceuticals, personal care and cosmetic industries.

Mr. Gagnon holds an M.Sc. in pharmacology and an M.B.A. from the Université de Sherbrooke and a certificate in General Management from the London Business School, UK. He completed the Directors Education Program at the Rotman School of Management of University of Toronto and is a member of the Canadian Institute of Corporate Directors.

Mr. Gagnon's qualifications to serve on the Board of Directors include his extensive experience in the healthcare and pharmaceutical industries, including his prior experience as Chief Executive Officer of Æterna Zentaris, a similar biotechnology company. As a result, Mr. Gagnon is well qualified to serve on our Board of Directors.

**Defendant Krassner**

51.     Defendant Stuart M. Krassner ("Krassner") has served as a director of Spectrum since December 2004 and was previously a member of the Company's Scientific Advisory Board from 1996 to 2001. Defendant Krassner is the Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee and the Compensation Committee. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Krassner beneficially owned about 321,250 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Krassner owned about $2.3 million worth of Spectrum stock.

52.     For the fiscal year ended December 31, 2015, Defendant Krassner received $199,588 in compensation from the Company. This included $67,500 in cash, $69,600 in stock awards, and $62,488 in option awards.

53.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Krassner made the following dispositions of Company stock. On July 7, 2015, Defendant Krassner disposed 625 shares of Company stock for $6.96 per share. On December 1, 2015, Defendant Krassner disposed 11,738 shares of Company stock for $6.00 per share. On June 27, 2016, Defendant Krassner disposed 880 shares of Company stock for $6.47 per share. On June 28, 2016,

Defendant Krassner disposed 3,523 shares of Company stock for $6.33 per share. According to the Form 4s filed by Defendant Krassner with the SEC, these dispositions were made to satisfy Defendant Krassner's tax withholding obligations. The shares disposed had been cancelled. Thus, in total, before the fraud was exposed, Defendant Krassner disposed 16,766 Company shares on inside information, for which he received $102,772 in proceeds.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

54.    The Company's 2016 Proxy Statement stated the following about Defendant Krassner:

> Dr. Krassner has been a director of Spectrum since December 2004 and was previously a member of our Scientific Advisory Board from 1996 to 2001. Dr. Krassner's career spans four decades of experience in various positions at the University of California, Irvine ("UCI"), most recently as Professor Emeritus of Developmental and Cell Biology at the School of Biological Sciences. While at UCI, he developed and reinforced US Food and Drug Administration ("FDA") and National Institute of Health ("NIH") compliance procedures for UCI-sponsored human clinical trials, established UCI's first Institutional Review Board, and at one time headed all contract and grant activities. Dr. Krassner has also been retained by a number of public and private pharmaceutical, medical device and other companies to provide scientific and regulatory advisory services, including FDA compliance. Dr. Krassner's work has been published in numerous peer-reviewed U.S. journals. Dr. Krassner has been awarded grants from the NIH, the National Science Foundation and the World Health Organization. Dr. Krassner has been a member of the American Society of Protozoology, the American Society of Tropical Medicine and Hygiene, the Corporation of the Marine Biological Laboratories in Woods Hole, MA among others. Dr. Krassner received a B.S. in Biology from Brooklyn College and a Sc.D. from the Bloomberg School of Public Health at Johns Hopkins University.

> Dr. Krassner's extensive and distinctive experience in business and academia brings valuable perspective to our Board. He has a strong background in research in the area of developmental and cell biology and his work in the field has been published in numerous peer-reviewed U.S. journals. Moreover, his expertise in scientific and regulatory advisory services, including FDA compliance, makes him well qualified to serve on our Board of Directors.

**Defendant Maida**

55.     Defendant Anthony E. Maida ("Maida") has served as a director of Spectrum since December 2003. Defendant Maida is the Chair of the Audit Committee and a member of the Placement Committee, the Nominating and Corporate Governance Committee, and the Product Acquisition Committee. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Maida beneficially owned about 267,448 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Maida owned about $1.9 million worth of Spectrum stock.

56.     For the fiscal year ended December 31, 2015, Defendant Maida received $202,088 in compensation from the Company. This included $70,000 in cash, $69,600 in stock awards, and $62,488 in option awards.

57.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Maida made the following dispositions of Company stock. On July 7, 2015, Defendant Maida disposed 881 shares of Company stock for $6.96 per share. On June 27, 2016, Defendant Maida disposed 880 shares of Company stock for $6.47 per share. On June 28, 2016, Defendant Maida disposed 3,523 shares of Company stock for $6.33 per share. According to the Form 4s filed by Defendant Maida with the SEC, these dispositions were made to satisfy Defendant Maida's tax withholding obligations. The shares disposed had been cancelled. Thus, in total, before the fraud was exposed, Defendant Maida disposed 5,283 Company shares on inside information, from which he benefited in the amount of $34,156. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

58.     The Company's 2016 Proxy Statement stated the following about Defendant

Maida:

> Dr. Maida has been a director of Spectrum since December 2003. Since June 2010, Dr. Maida has served as Senior Vice President, Clinical Research for Northwest Biotherapeutics, Inc., a cancer vaccine company focused on therapy for patients with glioblastoma multiforme and prostate cancer. Prior to that, from June 2009 through June 2010, Dr. Maida served as Vice President of Clinical Research and General Manager, Oncology, Worldwide for PharmaNet, Inc., a clinical research organization. Prior to joining Pharmanet, from 1997 through 2010, Dr. Maida served as Chairman, Founder and Director of BioConsul Drug Development Corporation and Principal of Anthony Maida Consulting International, servicing pharmaceutical firms, venture capital, hedge funds and Wall Street in the clinical development of therapeutic products and product/company acquisitions. Prior to that, from 1992 to September of 1999, Dr. Maida was President and Chief Executive Officer of Jenner Biotherapies, Inc., a company engaged in the development of immunotherapies to treat patients with cancer and certain side effects related to chemotherapy. During his tenure at Jenner, Dr. Maida moved four products into the clinic; one Phase III randomized clinical trial demonstrating clinical benefit to patients with osteogenic sarcoma which ultimately gained approval in Europe, two Phase II double-blinded randomized placebo controlled clinical trials in patients with prostate cancer and nine Phase I/II clinical trials. For over 25 years, Dr. Maida has focused on the clinical development of immunotherapies to treat patients with cancer. Dr. Maida has served in a number of executive roles, including, Chairman, CEO, COO, CSO, CFO and business development, and as a result his skill set includes the execution and oversight of finance, operations, research, and commercial clinical and scientific development, regulatory and manufacturing for the development of various therapeutic modalities. He is an expert in 'virtual' development and cost-cutting of operations in large and small biotechnology companies.
>
> Dr. Maida is currently a member of the Board of Directors of Stevia First Corp. (STVF), an OTCQB-quoted agricultural biotechnology company and also OncoSec Medical Inc. (ONCS), an OTCQB-quoted biopharmaceutical company developing its advanced-stage ImmunoPulse DNA-based immunotherapy to treat solid tumors. Dr. Maida serves on the advisory board of EndPoint BioCapital, Sdn Bhd (Kuala Lumpur, Malaysia), and as an advisor, consultant and technical analyst for CMX Capital, LLC, Sagamore Bioventures, Roaring Fork Capital, Toucan Capital, North Sound Capital, The Bonnie J. Addario Lung Cancer Foundation and Pediatric BioScience, Inc. Additionally, Dr. Maida has been retained by each of Abraxis BioScience, Inc., Northwest BioTherapeutics, Inc. and Takeda Chemical Industries, Ltd. (Osaka, Japan). Dr. Maida holds a B.A. in Biology, a B.A. in History, an M.B.A., a M.A. in toxicology and a Ph.D. in Immunology. He is a member of the American Society of Clinical Oncology, the American Association for Cancer Research, the Society of Neuro-Oncology, the

International Society for Biological Therapy of Cancer and the American Chemical Society. Dr. Maida holds a number of patents and patent applications associated with various therapeutic modalities and approaches.

Dr. Maida's qualifications to serve on the Board of Directors include the extensive experience he has gained holding senior management positions, including chairman, president, chief financial officer and chief executive officer, at various biotechnology and biopharmaceutical companies. He has successfully raised financing from venture capital and strategic investors for biopharmaceutical companies and he currently provides consulting services to hedge funds and venture capital firms interested in biopharmaceutical firms. Furthermore, Dr. Maida's vast knowledge in the area of clinical development of oncology products and product acquisitions, in addition to his continuous research in the field of oncology, provides unique and valuable insight to our Board of Directors. As a result, Dr. Maida is well qualified to serve on our Board of Directors.

**<u>Defendant Cohen</u>**

59.     Defendant Raymond W. Cohen ("Cohen") has served as a director of Spectrum since June 2013. Defendant Cohen is the Chair of the Compensation Committee and a member of the Audit Committee, the Placement Committee, and the Nominating and Corporate Governance Committee. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Cohen beneficially owned about 64,375 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Cohen owned about $456,420 worth of Spectrum stock.

60.     For the fiscal year ended December 31, 2015, Defendant Cohen received $207,088 in compensation from the Company.  This included $75,000 in cash, $69,600 in stock awards, and $62,488 in option awards.

61.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Cohen made the following dispositions of Company stock.  On July 7, 2015, Defendant Cohen disposed 625 shares of Company stock for $6.96 per share.  On June 27, 2016, Defendant Cohen disposed 625

Verified Shareholder Derivative Complaint

shares of Company stock for $6.47 per share. On June 28, 2016, Defendant Cohen disposed 2,500 shares of Company stock for $6.33 per share. According to the Form 4s filed by Defendant Cohen with the SEC, these dispositions were made to satisfy Defendant Cohen's tax withholding obligations. The shares disposed had been cancelled. Thus, in total, before the fraud was exposed, Defendant Cohen disposed 3,750 Company shares on inside information, for which he received $24,219 in proceeds.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

62.    The Company's 2016 Proxy Statement stated the following about Defendant Cohen:

> Mr. Cohen has been a director of Spectrum since June 2013.  He is an accredited public company director and a veteran life-science executive with over 30 years in the healthcare industry. Currently, Mr. Cohen serves as the CEO and member of the Board of Directors of Axonics Modulation Technologies, Inc., an Irvine, California based venture capital-backed developer of implantable neuromodulation technology. Mr. Cohen also serves as Chairman of the Board at a number of publicly traded and privately-held U.S. and European medical technology companies including Lombard Medical (NASDAQ: EVAR), a UK-based publicly traded commercial stage manufacturer and marketer of abdominal aortic aneurysm stent graphs; BioLife Solutions, Inc., (NASDAQ: BLFS) a Seattle-based, commercial-stage publicly traded manufacturer of preservation media products used to extend the viability of human cells; JenaValve Technology Inc., a Munich-based privately-held, commercial-stage manufacturer and marketer of transcatheter-delivered aortic valve systems; Syncroness, Inc., a Westminster, Colorado privately-held contract engineering firm; and a member of the Board of Directors of LifeWatch AG (LIFE.SW), a Zurich based Swiss public company engaged in the ambulatory ECG service business.
>
> From June 2010 to November 2012, Mr. Cohen was the Chief Executive Officer and member of the Board of Directors of Vessix Vascular, Inc., a privately-held developer of a novel renal denervation system for the treatment of hypertension which was acquired by Boston Scientific in November 2012. From 1997 to 2006, Mr. Cohen served as the Chairman and Chief Executive Officer of NASDAQ-listed Irvine, CA based Cardiac Science, Inc., a manufacturer of external automatic defibrillators which was ranked as the 4th fastest growing company in North America by Deloitte in 2004.  In 2008, Mr. Cohen was named by AeA as

the Private Company Life Science CEO of the Year. Mr. Cohen was named Entrepreneur of the Year in 2002 by the Orange County Business Journal. Mr. Cohen holds a B.S. in Business Management from Binghamton University.

Mr. Cohen brings to the Board of Directors over 30 years of experience in the healthcare industry, including currently serving as Chairman at several life science companies. As a result, Mr. Cohen is well qualified to serve on our Board of Directors.

**Defendant Vyas**

63.     Defendant Dolatrai Vyas ("Vyas") has served as a director of Spectrum since June 2013. Defendant Vyas is a member of the Compensation Committee, the Nominating and Corporate Governance Committee, and the Product Acquisition Committee. According to the Company's 2016 Proxy Statement, as of April 29, 2016, Defendant Vyas beneficially owned about 70,003 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on April 29, 2016 was $7.09, Vyas owned about $496,321 worth of Spectrum stock.

64.     For the fiscal year ended December 31, 2015, Defendant Vyas received $189,588 in compensation from the Company.  This included $57,500 in cash, $69,600 in stock awards, and $62,488 in option awards.

65.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Vyas made the following dispositions of Company stock.  On July 7, 2015, Defendant Vyas disposed 792 shares of Company stock for $6.96 per share.   On June 27, 2016, Defendant Vyas disposed 792 shares of Company stock for $6.47 per share. On June 28, 2016, Defendant Vyas disposed 3,170 shares of Company stock for $6.33 per share. According to the Form 4s filed by Defendant Vyas with the SEC, these dispositions were made to satisfy Defendant Cohen's tax withholding obligations. The shares disposed had been cancelled. Thus, in total, before the fraud was exposed, Defendant

Vyas disposed 4,754 Company shares on inside information, for which he received $30,703 in proceeds.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

66.    The Company's 2016 Proxy Statement stated the following about Defendant Vyas:

> Dr. Vyas has been a director of Spectrum since June 2013. He has 31 years' tenure in oncology drug discovery research at BMS, an NYSE-listed pharmaceutical company, where he served in various positions including most recently as a Group Director and Distinguished Research Fellow (Executive Level) in Oncology Discovery Chemistry. Dr. Vyas is considered one of the pioneers of the BMS oncology medicinal chemistry discovery efforts based on natural products derived cytotoxics. During this period he was also involved in BMS's pioneering research on antibody drug conjugate ("ADC") technology to target cytotoxics selectively to tumors. This technology in recent years has yielded valuable new biologics for treating a variety of cancers. In the last 15 years of his oncology research career at BMS, he was involved in discovery and development of personalized medicine research involving small molecule molecular targeted oncology therapeutics (e.g. kinase inhibitors). During his tenure at BMS in oncology drug discovery, he has participated in the discovery and development of 12 small molecules and one biologic (ADC) as clinical development candidates with one US Food and Drug Administration approved NDA. He has authored/co-authored over 110 publications and written numerous book chapters and review articles. He is also an inventor/co-inventor on more than 40 patents. He is an elected member of the Connecticut Academy of Sciences and Engineering ("CASE") and is also on the editorial board of Medicinal Research Reviews. Dr. Vyas retired from BMS in 2011 and subsequently formed a research and development consulting company, Dinesh Vyas, LLC. Currently, he is on the scientific advisory board of an Indian company and two US based companies. Dr. Vyas received a B.Sc. with honors in Chemistry/Geology from University College Nairobi (Kenya), University of East Africa in 1967 and a Ph.D. in Organic Chemistry from Queens University, Kingston, Canada in 1972.
>
> Dr. Vyas brings to the Board of Directors over 30 years of experience in the healthcare industry, especially in oncology drug research and development. As a result, Dr. Vyas is well qualified to serve on our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

67.     By reason of their positions as officers, directors, and/or fiduciaries of Spectrum and because of their ability to control the business and corporate affairs of Spectrum, the Individual Defendants owed Spectrum and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Spectrum in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Spectrum and its shareholders so as to benefit all shareholders equally.

68.     Each director and officer of the Company owes to Spectrum and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Spectrum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the officers and directors of Spectrum were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Spectrum, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Spectrum's Board at all relevant times.

72.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's conversations with government agencies and regulatory approval prospects of the Company's products, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

73.    To discharge their duties, the officers and directors of Spectrum were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of Spectrum were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Spectrum's own Code of Ethics[2] and Corporate Governance Guidelines;

---

[2] The Company's Code of Ethics is not available on its website.

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Spectrum conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Spectrum and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Spectrum's operations would comply with all applicable laws and Spectrum's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and

accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.     Each of the Individual Defendants further owed to Spectrum and the shareholders the duty of loyalty requiring that each favor Spectrum's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

75.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Spectrum and were at all times acting within the course and scope of such agency.

76.     Because of their advisory, executive, managerial, and directorial positions with Spectrum, each of the Individual Defendants had access to adverse, non-public information about the Company.

77.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Spectrum.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider transactions, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of

Section 14(a) of the Exchange Act, and the Individual Defendants' intentional disregard of the FDA's guidance; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Spectrum was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Spectrum, and was at all times acting within the course and scope of such agency.

**<u>SPECTRUM'S CORPORATE GOVERNANCE GUIDLINES</u>**

83.     Pursuant to the Company's Corporate Governance Guidelines (the "Corporate Guidelines"), the entire Board is subject to the corporate governance practices contained therein.

84.     The Corporate Guidelines provides, as to "Board Membership Criteria," that:

Nominees for the Board should be committed to enhancing long-term stockholder value and must possess a high level of personal and professional ethics, sound business judgment and integrity. The Board's policy is to encourage selection of directors who will contribute to the Company's overall corporate objectives, which include: enhancing stockholder value, technological innovation, leadership within the Company's market(s), effective execution of business strategies, high customer satisfaction, superior employee working environment, and reputation for honest and ethical business conduct.

85.     The Corporate Guidelines provides, as to "Role of the Board of Directors," that:

The principal duty of the Board is to exercise its powers in accordance with its fiduciary duties to the Company and act in a manner it reasonably believes to be in the best interests of the Company and its stockholders. To satisfy this duty, the directors are to take a proactive approach to their position and function as monitors of corporate management.

The day-to-day business and affairs of the Company are managed by or under the direction of the Board. Its primary duties are to:

> 1. Oversee the Chief Executive Officer who, together with senior management, runs the Company on a daily basis;
> 2. Monitor management's performance to ensure that the Company operates in an effective, efficient and ethical manner in order to produce value for the Company's stockholders; and
> 3. Periodically review the Company's long-term business plan, product development projects, capital expenditures, financing requirements and budget matters.

86.     The Corporate Guidelines provides, as to "Role of Senior Management," that:

Senior management, led by the Chief Executive Officer, is responsible for running the Company's day-to-day operations and appropriately communicating with the Board on the status of such operations.

87.     The Corporate Guidelines provides, as to "Board Meeting Attendance," that:

Attendance and active participation in meetings is an important component of each director's duties and will be taken into account by the Nominating Committee when assessing a director's performance and nomination for reelection as a director.

88.     The Corporate Guidelines provides, as to "Committees," that:

Board members are expected to be available to serve on the Company's committees to the extent eligible to do so. The Board currently has five standing committees to assist it in discharging its responsibilities: Audit, Compensation,

Nominating and Corporate Governance, Placement, and Product Acquisition. Each committee member must comply with the independence and other requirements established by applicable laws, rules, regulations and listing standards.

89.     The Corporate Guidelines provides, as to "Time Commitment," that:

Directors are expected to spend the time needed to prepare for and meet as frequently as the Board deems necessary or appropriate to discharge their responsibilities as Company directors. Senior management is responsible for preparing and distributing information to the directors that is important to the Board's understanding of the business to be conducted at Board or committee meetings. Directors are expected to review these materials in advance of each Board and committee meeting to the extent reasonably practicable.

90.     The Corporate Guidelines provides, as to "Ethics and Conflicts of Interest," that:

The Board expects its members, as well as the Company's officers and employees, to act ethically at all times, to adhere to any applicable codes of ethics, and to disclose any conflicts of interest to the appropriate officer or committee of the Board.

Directors are expected to avoid actual or apparent conflicts of interest. If an actual or potential conflict of interest develops, the director shall disclose to the rest of the Board or committee (or, if the conflict of interest constituted a related party transaction, to the Audit Committee) in advance of any Board or committee meeting at which any decisions are to be made or any actions are to be taken that would present or create the appearance of any conflict of interest for any director. If a director has a personal interest in a matter before the Board or committee, the director should, if appropriate, recuse themselves from Board or committee discussions of the matter and refrain from voting on that matter.

91.     The Corporate Guidelines provides, as to "Access to Information and Employees," that:

The Board expects to have complete, unfettered access to any information about the Company that he or she deems necessary or appropriate to carry out his or her duties as a director. This includes, among other things, access to the Company's employees, documents, records and facilities. At the request of the Board, senior management shall arrange to have other officers and managers to present at Board meetings who can provide additional insight into matters and actions being considered by the Board, and to attend or make reports to, and to answer questions from, members of the Board. The directors are to use their judgment to ensure that any such contact is not disruptive to the business operations of the Company or distract management from its duties.

92.     The Corporate Guidelines provides, as to "Formal Evaluation of Executive Officers," that:

On an annual basis, the Compensation Committee will evaluate the performance of the Chief Executive Officer and the other executive officers, as defined under Section 16 of the Securities Exchange Act of 1934 (collectively with the Chief Executive Officer, the "Executive Officers"), and will report such evaluations to the Board. Additionally, the Compensation Committee will determine the compensation of the Executive Officers, and will report such determination to the Board.

93. The Corporate Guidelines provides, as to "Board and Committee Evaluations," that:

The Board develops and maintains a process whereby the Board, its committees and its members are subject to evaluation and assessment. The Nominating Committee shall have the responsibility for conducting and overseeing the annual performance evaluations for the Board and reporting the results to the Board. Similarly, each committee of the Board will endeavor to conduct a self-evaluation at least annually for the purpose of determining whether it is functioning effectively.

94.     In violation of the Corporate Guidelines, the Individual Defendants who are members of the Board conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes, including the scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider transactions, waste of corporate assets, and unjust enrichment.   In violation of the Corporate Guidelines, the Individual Defendants who are members of the Board consciously disregarded their duties of loyalty, ethics, to act in the best interests of the Company, to use their free access to management to obtain all information necessary to fulfill their duties, and to assess their own performance as well as the CEO's.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

95.     Spectrum is a biotechnology company with a primary strategy comprised of acquiring, developing, and commercializing a broad and diverse pipeline of late-stage clinical and commercial products. One of the Company's products in late stage development is Apaziquone, also known as EOquin and Qapzola. Apaziquone is being developed for the treatment of NMIBC.

96.     According to the Company, there is a significant unmet medical need for the treatment of NMIBC due to the high rate of recurrence for the disease. The Company claimed that bladder cancer is the most expensive cancer to treat on a lifetime basis and no new drugs have been introduced in the market for treatment of NMIBC for more than 30 years. The Company thus believes that "EOquin/Apaziquone represents much needed therapy for patients and may provide a meaningful opportunity to reduce overall medical costs."

**New Drug Application and the Approval Process**

97.     New drugs seeking commercialization in the U.S. must be evaluated by the Center for Drug Evaluation and Research ("CDER") of the FDA. Before starting clinical trials on humans, a sponsor must test a new drug on animals for toxicity and then submit an Investigational New Drug ("IND") application to FDA based on the results from the animal testing. The IND application should include the drug's composition, manufacturing, and a plan for testing the drug on humans.

98.     Pre-marketing drug clinical trials are typically done in three phases.  Initial human studies, referred to as Phase 1, emphasizes safety. The goal of Phase 1 study is to determine what the drug's most frequent side effects are and, often, how the drug is metabolized and excreted. Phase 2 studies emphasizes effectiveness. The goal of Phase 2 study is to obtain preliminary data on whether the drug works in people who have a certain disease or condition. For controlled trials, patient receiving the drug are compared with similar patients receiving a different

Verified Shareholder Derivative Complaint

treatment- usually a placebo, or a different drug. Safety continues to be evaluated in this phase, and short-term side effects are studied. Finally, Phase 3 trials typically enroll thousands of individuals and provide the critical documentation of effectiveness and important additional safety data required for licensing. Phase 3 studies gather more information about safety and effectiveness by studying different populations and different dosages, and using the drug in combination with other drugs.[3]

99.     After the successful completion of pre-marketing clinical trials, the FDA would hold review meetings with a drug sponsor prior its submission of an NDA. If a sponsor decides to formally ask the FDA to approve a drug for marketing in the U.S., it may submit an NDA. To be considered, the NDA must include all animal and human data and analyses of the data, as well as information about how the drug behaves in the body and how it is manufactured. After the NDA is received, the FDA has 60 days to decide whether to file the NDA so it can be reviewed. If the FDA files the NDA, the FDA review team will begin to evaluate the sponsor's research on the drug's safety and effectiveness. The FDA will also review the drug's professional labeling and inspect the manufacturing facilities.

100.     Following the FDA's review of the NDA, the sponsor and the NDA may present their findings to FDA's advisory committee (which in this case is the ODAC). This non-FDA expert committee provides advice to the FDA regarding the safety and effectiveness of the drug for the proposed purpose. According to a study published in 2012, about 87% of the time the FDA has followed the recommendations of its advisory committees.[4]

---

[3] http://www.fda.gov/downloads/drugs/resourcesforyou/consumers/ucm284393.pdf.
[4] P Ma, N Singh, J Smith, S Townsend, "FDA Advisory Committee Outcomes," Nature Reviews Drug Discovery (2012).

101.    If a sponsor's FDA were not approved, FDA would then issue a CRL communicating its decision to not approve the application. The CRL is only issued for applications that are not approved.

**The FDA Guidance and the Apaziquone NDA**

102.    In 2007, the Company initiated two placebo-controlled, single-dose Phase 3 studies for Apaziquone/EOquin, the 611 Study and the 612 Study. The endpoint for both of the two studies was a 2-year recurrence rate.

103.    During the course of the studies, the FDA reviewed and approved the SAPs for both Studies 611 and 612. The SAPs were later amended for various purposes.

104.    The FDA-approved SAPs never contained a plan for pooling the data of Studies 611 and 612.

105.    In 2012, Spectrum completed the two Phase 3 clinical studies of Apaziquone and met with the FDA to discuss the results in December 2012. According to a slide presented by FDA staff at the later-held ODAC meeting on September 14, 2016, regulators advised Spectrum in the December 2012 pre-NDA meeting that each of the Company's Studies 611 and 612 "failed to meet the primary endpoint" and the Company should "NOT" submit an NDA based on the data from these two studies. A copy of the slide is below.

# Regulatory History 

- Special Protocol Assessment agreement given to study SPI-611 in February 2007.
  - Studies 611 and 612 form the basis of the NDA and are very similar.

- Pre-NDA meeting December 2012
  - Topline results: Each study failed to meet the primary endpoint.
  - We advised NOT to submit the NDA based on this data.

- NDA Submitted December 2015

106.     In December 2015, defying the FDA's advice, the Individual Defendants caused

Spectrum to submit an NDA for Apaziquone based on a post-hoc analysis of pooled data from

Studies 611 and 612.

107.     Moreover, beginning in March 13, 2015, the Individual Defendants personally

made, or caused the Company to make a series of materially false and misleading statements

regarding the FDA's guidance, the results of the Company's 611 and 612 Studies, the

Company's post-hoc analysis of integrated data from those two studies, and the approval

prospects of the Apaziquone NDA.

### March 13, 2015 Press Release and the 2014 10-K

108.     On March 13, 2015, the Company issued a press release reporting the Company's

clinical data and financial results for year 2014 ("3/13/15 Press Release"). Specifically, the

Company disclosed that Apaziquone had shown "statistically significant results in a post-hoc

subgroup analysis of two Phase 3 studies," and that the Company planned an NDA submission in

2015.

109.     The development highlights provided for Apaziquone in the 3/13/15 Press

Release are as follows:

- Adjuvant use of apaziquone for immediate intravesical instillation following
  transuretheral resection (TUR) of non-muscle invasive bladder cancer (NMIBC)
  demonstrate a high response rate of marker lesions (69%) with nearly 50% of patients
  remaining tumor-free after 18 months in Phase 1/Phase 2 studies.

- Reanalysis of data from two completed randomized, placebo-controlled Phase 3 studies
  demonstrates a lower 2 year recurrence rate with apaziquone compared to placebo in the

intent-to-treat (ITT) Population (**Study 1** (n=802): 36.9% versus 42.2%, respectively, p= 0.130; **Study 2** (n=812): 40.0% versus 46.1%, respectively, p= 0.082).

- Statistically significant differences in 2 year recurrence rates shown in the subgroup of ITT patients receiving apaziquone 30 to 90 minutes post-TUR (**Study 1** (n=141): 24.4% versus 40.7%, respectively, p= 0.040; **Study 2** (n=152): 32.9% versus 51.3%, respectively, p= 0.022) likely due to less post-TUR bleeding.

- Integrated analyses of the two Phase 3 studies also demonstrate statistically significant differences in 2 year recurrence rates for apaziquone versus placebo in both the overall TaG1G2 Population (n=1,146; 38.8% versus 45.5%, respectively, p= 0.022) and in the combined subgroup analysis (n=217; 28.2% versus 50.0%, respectively, p= 0.001).

- The drug is well tolerated with no systemic toxicities.

- An NDA submission for apaziquone based on the completed studies is planned for this year.

- A new Phase 3 study in NMIBC is planned that will specifically focus on the administration of apaziquone to all patients in the 31 to 90 minute window post-TUR, and will also include a second intravesical administration 8 days later.

110.   On the same day, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2014 ("2014 10-K"), which was signed by Defendants Shrotriya, Gustafson, Vyas, Lenaz, Krassner, Maida, Cohen, and Gagnon. The Company disclosed the following about Apaziquone, in relevant part:

APAZIQUONE is a bio-reductive alkylating indoloquinone that is enzymatically activated by enzymes that are over expressed by bladder tumors that is being tested in NMIBC. Pharmacokinetic studies have verified that APAZIQUONE is rarely detectable in the bloodstream of patients when it is administered either after surgical resection or as a part of a delayed multi-instillation protocol. APAZIQUONE is inactivated in the systemic circulation by the red blood cell fraction. The proposed dose therefore carries a minimal risk of systemic toxicity that could arise from absorption of a drug through the bladder wall into the bloodstream. These features of APAZIQUONE are distinct from other intravesical agents currently in use for the treatment of recurrent bladder cancer. An immediate instillation of APAZIQUONE may help by:
- reducing tumor recurrence by destroying dispersed cancer cells that would otherwise re-implant onto the inner lining of the bladder;
  o destroying remaining cancer cells at the site of tumor resection (also known as chemo-resection); and
- destroying tumors not observed during resection (also known as chemo-ablation).

We expect to prepare and submit a NDA with the FDA for APAZIQUONE in the fourth quarter of 2015.

111.    Regarding the Company's disclosure controls and procedures, the Company claimed in the 2014 10-K, as follows:

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of December 31, 2014, pursuant to Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures, as of such date, were effective.

112.    Attached to the 2014 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002 ("Sox"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sox, ("Sox Certifications"), signed by Defendants Shrotriya and Gustafson, attesting to the accuracy of the 2014 10-K.

**2015 Proxy Statement**

113.    On April 30, 2015, the Company filed the 2015 Proxy Statement with the SEC. The 2015 Proxy Statement stated the following concerning the Company's risk oversight:

**Risk Oversight**

Management is responsible for identifying our risk exposures and communicating such exposures to our Board. Our Board is responsible for implementing our risk oversight responsibilities. The Board does not have a standing risk management committee, but administers this function directly through the Board as a whole, as well as through committees of the Board. For example, the Audit Committee assists the Board in its risk oversight function by reviewing and discussing with management our accounting principles and procedures, financial reporting processes and system of disclosure controls and internal controls over financial reporting. The Nominating and Corporate Governance Committee assists the Board in its risk oversight function by periodically reviewing and discussing with management important corporate governance principles and practices and by considering risks related to our director nominee evaluation process. The Compensation Committee assists the Board in its risk oversight function by overseeing compliance with our executive compensation programs and considering risks relating to the design of our executive compensation programs

and arrangements. In addition, our compliance officer monitors our corporate compliance program and our compliance with applicable laws, rules and regulations and provides reports to our Board with respect to compliance matters and any related issues. The full Board considers strategic risks and opportunities and receives reports from the committees regarding risk oversight in their areas of responsibility as necessary. We believe our Board leadership structure facilitates the division of risk management oversight responsibilities among the Board committees and enhances the Board's effectiveness in fulfilling its oversight function with respect to different areas of our business risks and our risk mitigation practices.

### May 7, 2015 Press Release and Conference Call

114.    On May 7, 2015, the Company issued a press release entitled "Spectrum Pharmaceuticals Reports Continued Advancement of Robust, Late-Stage Pipeline and First Quarter 2015 Financial Results" ("5/7/15 Press Release"). The Company reiterated in the 5/7/15 Press Release that "an integrated analysis of two completed Phase 3 studies" of Apaziquone presented "statistically significant results," and that the Company planned to submit an NDA for Apaziquone in 2015.

115.    Defendant Shrotriya stated in the 5/7/15 Press Release that "We are making progress towards filing a NDA for Apaziquone, which targets a disease with high unmet need."

116.    The same day, the Company held a conference call to discuss the financial results for the first quarter of 2015. On the call, Defendant Shrotriya touted the study results of Apaziquone. He stated, in relevant part:

> [W]e're making progress in apaziquone, a potent, tumor-activated pro-drug for bladder cancer. ***There is a high unmet need in nonmuscle-invasive bladder cancer, and apaziquone has shown promising data in a previous Phase III program.*** In consultation with the FDA, we are now finalizing a protocol for an additional clinical trial. ***And soon after initiating the trial, we plan to file an NDA with the FDA before the end of this year.***

117.    On the same conference call, Defendant Turgeon discussed the future for Apaziquone, stating in relevant part:

> Also, we plan to file another NDA this year for apaziquone. This is an area of

significant unmet medical need and there's been no new product approved in the last 40 years.

118.    Defendant Allen provided an update on Apaziquone as well, stating in pertinent part:

> Finally, let me talk about apaziquone, our tumor-activated pro-drug for the treatment of nonmuscle invasive bladder cancer. At our Analyst Day, you heard how excited a leading urologist, Dr. Fred Witjes, was about apaziquone as potential benefit for patients with this disease who have a significant, unmet medical need. ***The analysis of integrated data from 2 completed clinical trials has demonstrated statistically significant increases in 2 year recurrence rates. We have discussed these data with the FDA and are well on our way with preparing our NDA submission this year.*** This submission will be made following the initiation of an additional study as was discussed with the FDA. As Joe mentioned, there's is a dearth of new therapies, ***and apaziquone has the potential to be the first new drug approved to treat nonmuscle-invasive bladder cancer in more than 40 years.***

119.    During the Q&A session of the call, Defendant Shrotriya had the following exchange with an analyst named Reni J. Benjamin from H.C. Wainwright & Co, LLC:

**Reni J. Benjamin - H.C. Wainwright & Co, LLC, Research Division**

Got it. Okay. And just switching gears to another program, apaziquone, what does that -- I know you're finalizing the protocol, can you give us any sort of sense as to how that trial is likely to shape up, maybe how big and how long it could take?

**Rajesh C. Shrotriya**

So Ren, you have followed apaziquone for a long time, and so I'll just give you the highlights of the trial. You remember the last trial, the end point of the trial was relapsed rate at 2 years. And when you look at the data of 2 years, we missed significance in each of those 2 studies, which were 500-patient trials. ***But when you combine the 2 studies, the data was highly significant at p-value 0.017. So we took that data, met with the FDA. And our understanding is and our decision is that we can go ahead and file the NDA with this drug, but FDA wanted us to start another trial, take all the learnings from the first 2 trials and incorporate them into the new protocol***. For example, if you -- when we look at our analysis of the earlier trials, we did not see significance at 2 years, but data was highly significant at 18 months, 12 months, 6 months, so one of the major change in the protocol for the next -- for the new trial is that we are looking at time to relapse rather than relapse at 2 years. So that goes in our favor, and there are some other minor tweaks to the protocol. For example, instead of giving it

once, we are now proposing to give this drug twice. So those are the 2 major
things, and there are other minor considerations. However, I have to tell you that
about 80 to 90 centers that participated in this trial, in earlier trials in Canada, in
U.S., they're all excited and ready to work with this new protocol.

**May 8, 2015 10-Q**

120.     On May 8, 2015, the Company filed a quarterly report on Form 10-Q with the

SEC for the first quarter ended March 31, 2015 ("1Q 2015 10-Q"), which was signed by

Defendant Gustafson. The Company disclosed in the 1Q 2015 10-Q that it entered into a letter

agreement with NDDO Research Foundation ("NDDO") in October 2008, pursuant to which the

Company agreed to make the following payments to NDDO in relation to Apaziquone

milestones: "(a) upon FDA acceptance of the NDA, the issuance of 25,000 of our common

shares and (b) upon FDA approval of the drug, a one-time payment of $0.3 million."

121.     Attached to the 1Q 2015 10-Q were Sox Certifications signed by Defendants

Shrotriya and Gustafson, attesting to the accuracy of the 1Q 2015 10-Q.

**August 6, 2015 Press Release and Conference Call**

122.     On August 6, 2015, the Company issued a press release reporting the financial

results for the second quarter of 2015 ("8/6/15 Press Release"). The Company advised investors

in the 8/6/15 Press Release that it was "on track for [Apaziquone] NDA filing by year end." The

Company further noted that it was "seeking an SPA[5] with the FDA before commencing an

additional confirmatory Phase 3 Study [of Apaziquone]."

123.     On the Company's August 6, 2015 conference call, Defendant Shrotriya again

discussed Apaziquone, stating that:

> Lastly, we're on track to file an NDA by the end of this year on Apaziquone, a
> novel drug for non-muscle-invasive bladder cancer. In addition, a confirmatory
> trial with Apaziquone is being pursued with the FDA through another special
> protocol assessment.

---

[5] SPA refers to "Special Protocol Assessment."

Verified Shareholder Derivative Complaint

124.     Defendant Turgeon provided update on Apaziquone as well, stating:

Also, we plan to file another NDA by the end of the year for Apaziquone, a potent, tumor-activated pro-drug for bladder cancer. This will be our third NDA in three years. In consultation with the FDA, we are pursuing a special protocol assessment for confirmatory clinical trial. Bladder cancer is an area of significant unmet medical need with no new products approved in the last 40 years.

125.     Defendant Allen further discussed Apaziquone and stated in pertinent part:

Finally, I'll talk about Apaziquone, our tumor-activated pro-drug for the treatment of non-muscle-invasive bladder cancer. As we discussed with you in our March Investor Day meeting, this remains an area with a large unmet medical need. *Our analysis of the integrated data from the two large completed randomized Phase 3 settings with Apaziquone demonstrated a statistically significant decrease in two-year recurrence rates in patients with early bladder cancer.*

*We have discussed these data with the FDA and are well on our way to complete the Apaziquone NDA that will be submitted in the fourth quarter of this year.* This will be the third NDA Spectrum has submitted to the Agency over the past three years.

*The Apaziquone submission will be made following initiation of an additional Phase 3 study that is being discussed with FDA under the special protocol assessment process. Given the lack of new therapies for these patients, Apaziquone has the potential to be the first new drug approved to treat non-muscle-invasive bladder cancer in more than 40 years.*

We continue to be focused on our key priorities in our development program and I'm very confident in our team's ability to execute on our goal and successfully deliver on the value of Spectrum's promising pipeline.

126.     In the Q&A session of the call, Defendant Shrotriya had the following exchange

with an analyst named Chris Howerton:

**Chris Howerton**

And then just another quick one on Apaziquone, in terms of the FDA's review of your NDA that you plan to submit towards the end of this year, when will they review that once you have data in hand from the confirmatory trial or they start reviewing the data and potentially provide you with a PDUFA data after acceptance of that NDA?

**Rajesh Shrotriya**

The FDA wants us to do a confirmatory trial. ***The understanding that we have is that if we're able to submit the old two trials 611, 612, that you combine***, as you remember, each study alone is not significant [indiscernible] submitted with those protocols. ***However, when you combine those two studies, then the data becomes highly significant. So those two studies combined are going to be treated as one study and FDA wanted us to start another trial for which FDA's input has been sought and is being further solidified by this.***

The understanding is that the FDA – we can file the NDA now, but the FDA will not review it, FDA will send it to DAC, but will not send it until we have included enrolled majority of the patients in the new trial. And the understanding – the FDA said that if we approve your drug now, or review your drug application now, there is no way you can complete a placebo-controlled trial.

Let me remind you the protocol that we're now planning to do is a placebo-controlled study. And therefore to answer your question, until majority of the patients have been enrolled into this trial, the NDA will not be – the ODAC meeting will not be held, I'm sure at the end some review at the FDA will continue.

### August 17, 2015 Press Release

127.    On August 17, 2015, the Company issued a press release entitled "Spectrum Pharmaceuticals Announces Agreement with FDA on the Special Protocol Assessment (SPA) for the Upcoming Apaziquone Phase 3 Trial in Patients with Non-Muscle Invasive Bladder Cancer (NMIBC)" ("8/17/15 Press Release"). The Company stated in the press release that it was "on track for Apaziquone filing by year end based on pooled data from two completed Phase 3 studies that showed a statistically significant reduction in 2-Year recurrence rates." According to the Company, "learnings from earlier Phase 3 program and FDA's comments [had been] incorporated in new Phase 3 study design," and this new Phase 3 study "would satisfy FDA's requirement of initiating an additional Phase 3 study before Apaziquone NDA submission."

128.    The 8/17/15 Press Release quoted Defendant Shrotriya as stating the following:

Spectrum's agreement with the FDA on the SPA represents a significant milestone for bladder cancer patients…The learnings from previous Phase 3 studies and comments from the FDA have been incorporated in the new protocol to improve the chances of success. ***We look forward to initiating this trial and filing the apaziquone NDA by year-end. This NDA is based on data from the previously***

> *completed program that included two Phase 3 studies with a total of 1,615 patients.* We believe there continues to be a significant unmet need for these patients, as no drugs have been approved in the U.S. for more than 40 years for the treatment of low-grade NMIBC. Due to the high rate of recurrence, the overall cost of the treatment of bladder cancer in the U.S. is a staggering $3.4 billion annually, most of which is related to direct treatment of the disease. We endeavor to bring this much needed therapy for patients and help reduce overall medical costs at the same time

(Emphasis added.)

129.    Pursuant to the Company's SPA, the new Phase 3 trial would be a randomized, double-blind, placebo-controlled, multicenter trial with patients receiving one or two instillations immediately following transurethral resection of bladder tumor. The primary endpoint of this trial was still time to recurrence. As the Company noted, this trial was designed to further evaluate the intravesical use of Apaziquone for the treatment of patients with NMIBC.

**October 26, 2015 Press Release, December 16, 2015 8-K, and February 19, 2016 Press Release**

130.    On October 26, 2015, the Company issued a press release announcing that it had initiated the new Phase 3 trial for Apaziquone and the first patient was dosed on October 23, 2015 ("10/26/15 Press Release"). Defendant Shrotriya touted in the 10/26/15 Press Release that "Apaziquone has the potential to usher in an importantly needed paradigm shift in the treatment of NMIBC, as the first new drug in its indication in over 40 years." Defendant Shrotriya then went on to discuss the new Phase 3 trial and stressed once again the "statistically significant" results showed by the "pooled data from the previously completed Phase 3 studies that enrolled over 1,600 patients." He advised investors that "[t]hese existing Phase 3 data form the basis of the NDA that [the Company] plan[s] to submit to FDA before the end of the year."

131.    The 10/26/15 Press Release also contains the following positive statements from Lawrence Karsh, Director of Research at The Urology Center of Colorado:

> *I am impressed with the data and the activity of apaziquone in NMIBC that I*

*have seen so far in clinical trials*….The addition of a new *effective* therapy for this recurring disease would help to address the high unmet medical need, offer patients an important new treatment option, and potentially reduce the healthcare costs associated with the treatment of NMIBC.

(Emphasis added.)

132.     On December 16, 2015, the Company filed a Form 8-K with the SEC announcing that it had submitted to the FDA an NDA for Apaziquone.

133.     On February 19, 2016, the Company issued a press release announcing FDA's acceptance of NDA filing for Apaziquone (known as EOquin since then). The Company indicated that the FDA planned to hold an advisory committee meeting regarding the NDA and had set a target action date under the PDUFA for December 11, 2016.

### March 9, 2016 Conference Call

134.     On March 9, 2016, the Company held a conference call to discuss the financial results for the fourth quarter and full year of 2015. On the call, Defendant Shrotriya had the following exchange with an analyst named Swayampakula Ramakanth:

**Swayampakula Ramakanth**

Okay. And then on the EOquin, certainly, FDA has provided you with a PUDFA date of December 11, 2016. And will there be any possibility of interim data by that date? And also what's the possibility that FDA could decide to wait for the completion of this study before giving you a final decision?

**Rajesh Shrotriya**

So if I understand your question, it's about EOquin, apaziquone, a bladder cancer drug, whether the FDA is likely to wait for the current trial – ongoing trial to be completed. That's a question that I can't really answer as you know. We have submitted data based on three things. Number one, *we know that our drug is active based on not only the market lesion is very impressive that you leave a tumor behind, and the only thing you give to these patients is give a single dose of EOquin and 69% patients had complete responses.*

*And then the Phase 3 trials that we did 611/612, we saw the drug was extremely safe. And for the technical reasons we have done reanalysis. We have submitted to the FDA. As you know that we – when we studied, each study was not*

*positive, p-value was not less than 0.05. However, when we combine the two trials then the study data was highly significantly positive.*

*In this unmet medical need, no drug has been approved in the space.* And when we talk to experts, we believe that the – that this unmet medical need, in fact, the only other drug that is used in Europe, for example, is Mitomycin and in some of the centers.. And Mitomycin is, as you know, causes sloughing of the two –of the healthy tissues. So urologists are very afraid to give a drug like Mitomycin, which is very toxic. As compared to that in our experience of treating now two – conducting two large studies with over 600 patients each, we found that our drug is relatively safe and we feel good about it.

## 2015 10-K

135.    On March 14, 2016, the Company filed an annual report on Form 10-K with the

SEC for the year ended December 31, 2015 ("2015 10-K"), which was signed by Defendants

Shrotriya, Gustafson, Vyas, Lenaz, Krassner, Maida, Cohen, and Gagnon.  Concerning the

development and approval process of Apaziquone/ EOquin, the Company stated in the 2015 10-

K, in pertinent part:

> EOQUIN (formerly referred to as APAZIQUONE): In August 2015, we reached agreement with the FDA on the SPA of the planned Phase 3 clinical trial of EOQUIN. This trial commenced with its first patient dosing in October 2015 and is designed to evaluate the intravesical use of this drug for the treatment of patients with non-muscle invasive bladder cancer (NMIBC) as one or two instillations, immediately following transurethral resection of bladder tumor (TURBT). Due to the high rate of recurrence for NMIBC, there is a significant unmet medical need and the overall cost of bladder cancer treatment in the U.S. is $3.4 billion annually, most of which is related to the direct treatment of this disease. Accordingly, this drug represents much-needed therapy for patients and provides a meaningful opportunity to reduce overall medical costs. In December 2015, we submitted our NDA for EOQUIN with the FDA, and in February 2016, the FDA communicated its acceptance of this NDA with a target decision date of December 11, 2016.

136.    With regard to the effectiveness of the Company's disclosure controls and

procedures, the Company stated, in pertinent part:

> **Disclosure Controls and Procedures**
>
> We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of

December 31, 2015, pursuant to Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures, as of such date, were effective.

137.    Attached to the 2015 10-K were Sox Certifications signed by Defendants Shrotriya and Gustafson, attesting to the accuracy of the 2015 10-K.

**2016 Proxy Statement**

138.    On April 29, 2016, the Company filed the 2016 Proxy Statement with the SEC. As part of the Company's illustration of its achievements with respect to predetermined "critical business objectives," the 2016 Proxy Statement contained the following information about Apaziquone:

APAZIQUONE: In August 2015, we reached an agreement with the FDA on the Special Protocol Assessment of the planned Phase 3 clinical trial of apaziquone. This trial commenced with its first patient dosing in October 2015 and is designed to evaluate the intravesical use of apaziquone for the treatment of patients with non-muscle invasive bladder cancer (NMIBC) as one or two instillations, immediately following transurethral resection of bladder tumor (TURBT). Due to the high rate of recurrence for NMIBC, there is a significant unmet medical need and the overall cost of bladder cancer treatment in the U.S. is approximately $3.4 billion annually, most of which is related to the direct treatment of this disease. Accordingly, we believe this drug represents a much-needed therapy for patients and provides a meaningful opportunity to reduce overall medical costs. In December 2015, we submitted our NDA for apaziquone with the FDA, and in February 2016, the FDA accepted this NDA for review with a target decision date of December 11, 2016.

139.    Concerning the Company's risk oversight, the Company disclosed in the 2016 Proxy Statement, in pertinent part:

**Risk Oversight**

Management is responsible for identifying our risk exposures and communicating such exposures to our Board. Our Board is responsible for implementing our risk oversight responsibilities. The Board does not have a standing risk management committee, but administers this function directly through the Board as a whole, as well as through committees of the Board. For example, the Audit Committee assists the Board in its risk oversight function by reviewing and discussing with management our accounting principles and procedures, financial reporting processes and system of disclosure controls and internal controls over financial

reporting. The Nominating and Corporate Governance Committee assists the Board in its risk oversight function by periodically reviewing and discussing with management important corporate governance principles and practices and by considering risks related to our director nominee evaluation process. The Compensation Committee assists the Board in its risk oversight function by overseeing compliance with our executive compensation programs and considering risks relating to the design of our executive compensation programs and arrangements. In addition, our compliance officer monitors our corporate compliance program and our compliance with applicable laws, rules and regulations and provides reports to our Board with respect to compliance matters and any related issues. The full Board considers strategic risks and opportunities and receives reports from the committees regarding risk oversight in their areas of responsibility as necessary. ***We believe our Board leadership structure facilitates the division of risk management oversight responsibilities among the Board committees and enhances the Board's effectiveness in fulfilling its oversight function with respect to different areas of our business risks and our risk mitigation practices.***

(Emphasis added.)

### May 5, 2016 Conference Call

140.   On May 5, 2016, the Company held a conference call to discuss the financial results for the first quarter of 2016. On the call, Defendant Shrotriya reminded the investors that the Company is "expecting an advisory panel and an FDA decision on [A]paziquone NDA for treating bladder cancer by December 11 [2016]."  Defendant Shrotriya then went on to tout that "2016 is going to be such an exciting year in Spectrum."

141.   Defendant Turgeon also talked about Apaziquone on the call. He stated, in relevant part:

> Lastly, let me talk about apaziquone, our potent tumor activated drug for bladder cancer. In the first quarter, he FDA accepted our IND filing and provided us with a PDUFA date of December 11, 2016. The FDA also indicated that it plans to hold an advisory committee meeting regarding the NBA [ph].

> Our team is already preparing for that advisory committee meeting. Overall the first quarter has been productive and we keep progressing our late stage pipeline. We are focused on developing three drugs that target large indications such as breast cancer and bladder cancer. I am really enthusiastic about our portfolio of late stage drugs. If any of these drugs are successful it could transform spectrum as we know it today. We remain focused on the goals ahead and look forward to

updating you on our progress.

142.    During the Q&A session of the call, Defendant Shrotriya had the following

exchange with an analyst named Chris Howerton:

**Chris Howerton**

Hi thanks for taking the questions. I guess just most of my questions were
answered in the call and other questions, but in terms of the upcoming expected
advisory committee for apaziquone and of course the PDUFA following that.
What are your expectations in terms of the sensitivities around the data and your
confidence in terms of their being a positive discussion with the committee and
regulators?

**Rajesh Shrotriya**

***Well, clearly we are very excited about the data we have submitted to the FDA.
It is because of our excitement. It is because we are convinced the drug is safe
and effective that we have put together the NDA and we are very pleased that
the FDA has accepted it for review and have now given us a PDUFA date. So
these are all exiting for us, exciting times for the drug;*** however, much will
depend on the PDUFA date and I have no idea how the PDUFA, I mean the
ODAC Panel will.

One of my concerns has always been that the ODAC Panel consists of
oncologists. However, apaziquone is a drug that is to be used by urologists and
urologists are the ones who treat bladder cancer. So time will tell. ***I am hoping
that the ODAC Panel will see what we are seeing that the drug is safe and
effective and there is unmet medical need.*** Don't forget in the last 40 years no
drug has been approved for nonmuscle invasive bladder cancer. There is definite
unmet medical need. ***So we are being quite excited about the data and about the
upcoming ODAC Panel and PDUFA date.***

**May 6, 2016 10-Q**

143.    On May 6, 2016, the Company filed a quarterly report on Form 10-Q with the

SEC for the first quarter ended March 31, 2016 ("1Q 2016 10-Q"), which was signed by

Defendant Gustafson. Concerning the Apaziquone NDA, the 1Q 2016 10-Q stated, in pertinent

part:

In August 2015, we reached agreement with the FDA on the SPA of the planned
Phase 3 clinical trial of APAZIQUONE. This trial commenced with its first
patient dosing in October 2015, and is designed to evaluate the intravesical use of

this drug for the treatment of patients with non-muscle invasive bladder cancer ("NMIBC") as one or two instillations, immediately following transurethral resection of bladder tumor ("TURBT"). Due to the high rate of recurrence for NMIBC, there is a significant unmet medical need and the overall cost of bladder cancer treatment in the U.S. is $3.4 billion annually, most of which is related to the direct treatment of this disease. Accordingly, this drug represents much-needed therapy for patients and provides a meaningful opportunity to reduce overall medical costs. In December 2015, we submitted our NDA for APAZIQUONE with the FDA, and in February 2016, the FDA communicated its acceptance of this NDA with a target decision date of December 11, 2016.

144.    The 1Q 2016 10-Q also disclosed that, on March 18, 2016, pursuant to the letter agreement the Company entered into with NDDO in October 2008, and as a result of a milestone payment obligation triggered by the FDA's acceptance of the Apaziquone NDA for review, the Company issued an aggregate of 25,000 shares of common stock to three non-U.S. investors who were licensors (including their successors) under the letter agreement.

145.    Attached to the 1Q 2016 10-Q were Sox Certifications signed by Defendants Shrotriya and Gustafson, attesting to the accuracy of the 1Q 2016 10-Q.

**August 9, 2016 10-Q and Conference Call**

146.    On August 9, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2016 ("2Q 2016 10-Q"), which was signed by Defendant Gustafson. Concerning the Apaziquone NDA, the Company disclosed in the 2Q 2016 10-Q, in pertinent part:

QAPZOLA (formerly referred to as APAZIQUONE), a potent tumor-activated drug being investigated for non-muscle invasive bladder cancer: The FDA accepted the NDA and has given Spectrum a PDUFA date of December 11, 2016. The FDA plans to hold an advisory committee meeting regarding the NDA on September 14, 2016. The Company is actively enrolling an additional randomized, placebo-controlled Phase 3 trial under an SPA agreement. The Phase 3 study has been specifically designed to build on learnings from the previous studies, as well as recommendations from the FDA.

(Emphasis in original.)

147.    Attached to the 2Q 2016 10-Q were Sox Certifications signed by Defendants Shrotriya and Gustafson, attesting to the accuracy of the 2Q 2016 10-Q.

148.    On August 9, 2016, the Company also held a conference call to discuss the financial results for the second quarter of 2016. On the call, Defendant Shrotriya stated the following about Apaziquone/Qapzola:

> Our third drug, Qapzola is being studied in non-muscle invasive bladder cancer. A new drug application is under active review by the FDA. We look forward to making a presentation to the FDA's Advisory Committee next month. The FDA has established a decision date of December 11.

149.    Defendant Turgeon also discussed Apaziquone on the call, stating in pertinent part:

> Lastly, let me talk about QAPZOLA, also known as apaziquone, our potent tumor-activated drug for bladder cancer. This Phase 3 data from QAPZOLA was presented at an oral presentation at the 2016 annual AUA meeting in May. There are a couple of important milestones for this drug later this year.
>
> First, we have an FDA Advisory Panel on September 14, and we are currently preparing for that Advisory Panel meeting. We have engaged with experts in the field of urology to assist us in this important endeavor. The FDA is expected to make a decision on the approval of this drug by the PDUFA date of December 11, 2016.

150.    In the Q&A session of the call, Defendant Shrotriya had the following exchange with an analyst named Adnan Butt from RBC Capital Markets:

**Adnan Butt**

Thank you. A couple of pipeline questions, and then maybe a question for Kurt as well. So first on apaziquone, could you tell us the FDA's review timeline or FDA's approval decision, is that contingent upon achieving a certain enrollment in the ongoing Phase 3 study?

**Rajesh Shrotriya**

***So Adnan, thank you for your question. To best of my knowledge and understanding the FDA's decision will be based on the application that we have filed, NDA, rather than on the ongoing study.***

151.     The statements referenced above in ¶¶108-150 were materially false and misleading at the time when they were made because they misrepresented and failed to disclose the following facts, which were known to the Individual Defendants or recklessly disregarded by them: 1) both of the Company's 611 and 612 Studies did not meet the pre-specified criteria for superiority when compared to a placebo; 2) the FDA previously questioned whether the data from the Company's 611 and 612 Studies were clinically meaningful; 3) the Company's pooled analysis of the integrated data from these two studies was done post-hoc and was not part of the approved SAPs; and 4) the FDA advised the Company not to submit the NDA for Apaziquone based on data from the 611 and 612 Studies.

**The Truth Emerges**

152.     On September 14, 2016, the FDA published on its website a briefing document ("Briefing Document") that contains background information it prepared for the members of the ODAC before the ODAC meeting. The significant review issues identified by the FDA concerning the Apaziquone NDA include:

- The failure to demonstrate a reduction in 2 year recurrence with apaziquone when compared to placebo in each study;
- The clinical relevance of the magnitude of reduction in 2 year recurrence associated with apaziquone; and
- Post-hoc, hypothesis-generating analyses that are currently being tested in an ongoing clinical trial that is conducted under a Special Protocol Agreement.

153.     Under the Regulatory History section of the Briefing Document, the FDA stated, in pertinent part:

In February 2007, a Special Protocol Assessment agreement was reached concerning Study 611. As part of the special protocol assessment, FDA recommended 2 year recurrence as the primary endpoint. This was based on the extensive use of endpoints such as 18 month recurrence, 2 year recurrence, etc. in the urology literature. Study 612 was not conducted under a special protocol assessment, but is similar in design to 611. *In December 2012, the Agency noted that both 611 and 612 did not meet the pre-specified criteria for superiority*

> ***when compared to placebo and that the pooled analysis, using data from both studies, was done post-hoc and was not part of the statistical plan. The Agency discouraged the Applicant from submitting a NDA and questioned whether the effect size was clinically meaningful.***

(Emphasis added.)

154.    According to the FDA, back in 2012, the FDA had noted that both of the Company's studies 611 and 612 did not provide satisfactory data and discouraged the Company from submitting an NDA based on data from its previous phase 3 studies.

155.    The FDA advised the ODAC in the Briefing document that the 611 and 612 studies "did not make statistical significance." Specifically, "the magnitude of the observed, numerical reduction of the rate of recurrence was less than that seen with current therapy, precluding accelerated approval." With respect to the Company's pooled analysis of Studies 611 and 612, the FDA stated, "[t]he multiple, post-hoc, hypothesis-generating analyses of Studies 611 and 612 have resulted in optimization efforts that are currently being tested in an ongoing clinical trial that is conducted under a Special Protocol Agreement."

156.    The same day, the ODAC held a meeting to discuss the Apaziquone NDA. During the meeting, FDA staff presented the slide referenced above, which revealed that the FDA had advised Spectrum "NOT to submit the NDA" based on the data from Studies 611 and 612. Unsurprisingly, ODAC voted against approving Qapzola/Apaziquone on the basis that Apaziquone had not shown substantial evidence of a treatment effect over placebo.

157.    Later that day, Spectrum issued a press release entitled "FDA Advisory Committee Votes that Qapzola (apaziquone) Has Not Shown Substantial Evidence of a Treatment Effect Over Placebo" to announce the ODAC decision" ("9/14/16 Press Release").

158.    To assuage fears, in addition to announcing the ODAC decision, the Company also stressed in the 9/14/16 Press Release that "[t]he committee recommendation is not binding

on the FDA, which makes the final decision on approval." The Company then reminded investors that the PDUFA action date for the Apaziquone NDA is December 11, 2016.

159.    However, as stated above, about 87% of the times the FDA has followed the recommendations of its advisory committees. The 13% chance left for Apaziquone was likely obliterated by the fact that ODAC had voted against Apaziquone unanimously (14-0).

160.    On this news, shares of Spectrum fell sharply from its previous closing price of $5.49 per share to trade as low as $4.69 per share on September 14, 2016 and eventually closed at $5.04 per share that day.

161.    On September 16, 2016, a columnist for TheStreet.com published an article entitled "Spectrum Pharma, FDA and the Buried Truth About a Bladder Cancer Drug Meeting," disclosing that Spectrum "hid from investors a key detail of a meeting with the [FDA] in which regulators told the [C]ompany not to seek approval for [Apaziquone] because two clinical trials failed to benefit patients." As the author pointed out, Defendant Shrotriya's statements made in the May 7, 2015 conference call were "not a fully truthful summary of the FDA's guidance to Spectrum." By hiding from the investors FDA's recommendation and comments, Spectrum "join[ed] an unacceptably long list of drug and biotech companies hurting investors by failing to be fully transparent about their communications with the FDA." The TheStreet article also incorporated the slide presented by FDA staff in the ODAC meeting.

162.    On September 19, 2016, an analyst named Samreen Agha published an article on Seeking Alpha discussing the Company's failure to disclose the FDA's guidance and commenting "the management is not trustworthy." The author pointed out that the Company's "communication pattern with the investors is [] flawed" and "the CEO should have been more

objective regarding [the Apaziquone NDA] process." The author suggested that "the red flags must be addressed and the management has to work on its communication with investors."

163.   Moreover, the author of the Seeking Alpha article also expressed concern over the fact that Spectrum management has been "very forthcoming regarding the pipeline and forecasts of the drugs already approved," and that "a sound management does not make these kinds of mistakes and the estimates most often translate to actual events[.]"

164.   On this news, Spectrum's share price fell $0.32 per share or 6.3% over five days to close at $4.72 per share on September 19, 2016.

165.   On November 18, 2016, the Company filed a current report on Form 8-K with the SEC ("11/17/16 8-K") announcing that the Company had "received a [CRL] from the [FDA] with respect to the Company's [NDA] for QAPZOLA (apaziquone for intravesical instillation)." The Company also disclosed that it "met with the FDA to discuss the strategy for further development of QAPZOLA" and "[b]ased on the discussion, the Company is evaluating a new smaller study that would replace the ongoing Phase 3 program in which enrollment has been stopped."

### Summary of Defendants' Misconduct

166.   In breach of their fiduciary duties, the Individual Defendants recklessly managed the Company by causing the Company to ignore and defy the FDA's guidance, which resulted in unnecessary expenses and damages to the Company.

167.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

168.   In further breach of their fiduciary duties owed to Spectrum, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or

misleading statements and omissions of material fact concerning the FDA's guidance, the results of the Company's 611 and 612 Studies, the Company's post-hoc analysis of integrated data from those two studies, and the approval prospects of the Apaziquone NDA. Specifically, the Individual Defendants failed to disclose and caused the Company to fail to disclose that: 1) both of the Company's 611 and 612 Studies did not meet the pre-specified criteria for superiority when compared to a placebo; 2) the FDA previously questioned whether the data from the Company's 611 and 612 Studies were clinically meaningful; 3) the Company's pooled analysis of the integrated data from these two studies was done post-hoc and was not part of the approved SAPs; and 4) the FDA advised the Company not to submit the NDA for Apaziquone based on data from the 611 and 612 Studies.

## DAMAGES TO SPECTRUM

169. As a direct and proximate result of the Individual Defendants' conduct, Spectrum will lose and expend many millions of dollars.

170. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO-Chairman, CFO, and President, and Chief Medical Officer and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

171. Such costs include, but are not limited to the costs incurred from causing the Company to submit an NDA based on data known by the Individual Defendants to be insufficient and inappropriate.

172. Such costs include the unnecessary payment made by the Company under the NDDO letter agreement.

173.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

174.     As a direct and proximate result of the Individual Defendants' conduct, Spectrum has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

175.     Plaintiff brings this action derivatively and for the benefit of Spectrum to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Spectrum, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violation of Section 14(A) of the Exchange Act, as well as the aiding and abetting thereof.

176.     Spectrum is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

177.     Plaintiff is, and has been since before the beginning of the Relevant Period, a shareholder of Spectrum.  Plaintiff will adequately and fairly represent the interests of Spectrum in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

Verified Shareholder Derivative Complaint

## DEMAND FUTILITY ALLEGATIONS

178.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

179.   A pre-suit demand on the Board of Spectrum is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven Individual Defendants: Defendants Shrotriya, Gagnon, Lenaz, Cohen, Krassner, Maida, and Vyas (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to four of the seven directors that were on the Board at the time this action was commenced.

180.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to waste corporate assets by acting against the FDA's explicit guidance, and to make false and misleading statements and omissions of material facts, while six of them engaged in insider transactions based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

181.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the conduct alleged herein.  The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

182.   Additional reasons that demand on Defendant Shrotriya is futile follow. Defendant Shrotriya was the Company's Chairman and CEO at all relevant times, and is thus, as the Company admits, a non-independent director. Indeed, Defendant Shrotriya receives millions

of dollars in compensation from the Company annually. For example, Defendant Shrotriya received total compensation of $4,422,565 for 2015. Defendant Shrotriya was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, many of which he signed, and including many of which he personally made. His large Company stock holding, worth approximately $62.5 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the fraud was exposed, which yielded $588,298 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Shrotriya is a defendant in the Securities Class Actions.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  For these reasons, too, Defendant Shrotriya breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Gagnon is futile follow.  Defendant Gagnon was a Company director at all relevant times. From 2008 to 2015, Defendant Gagnon also served as President of Spectrum Pharma Canada Inc., an affiliate of Spectrum. Thus, Defendant Gagnon was beholden to and dependent on the Company and the Board for his employment. Indeed, the Company has admitted in its 2016 Proxy Statement that Defendant Gagnon is not considered an independent director under the NASDAQ listing rules. Moreover, Defendant Gagnon's large Company stock holding, worth approximately $939,425 before the

fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, Defendant Gagnon conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein as he signed the Company's Form 10-Ks.  For these reasons, too, Defendant Gagnon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Lenaz is futile follow.  Defendant Lenaz was a Company director since June 2010. Previously, Defendant Lenaz served as Spectrum's Chief Scientific Officer from February 2005 to June 2008 and as President of Spectrum's Oncology Division from 2000 to 2005. Since retiring as Spectrum's Chief Scientific Officer in June 2008, Defendant Lenaz provided consulting services to Spectrum from June 2008 to June 2010. Thus, like Defendant Gagnon, Defendant Lenaz was beholden to and dependent on the Company and the Board for his livelihood for many years. Indeed, Defendant Lenaz lacks independence from Defendant Shrotriya because he has worked with and served as colleague or subordinate of Shrotriya for decades. Prior to serving Spectrum, from 1997 to 2000, Defendant Lenaz served as Senior Vice President of Clinical Research, Medical Affairs at SuperGen, Inc., for which Defendant Shrotriya served as Executive Vice President and Chief Scientific Officer. Even before that, Defendant Lenaz and Shrotriya worked together at Bristol-Myers Squibb

Company. According to a complaint filed in 2013 against certain of the Individual Defendants,[6]

Defendant Shrotriya made the following statement to analysts at the March 20, 2013 Roth

Conference:

> "He [Lenaz] was in oncology division of Bristol Myers for 22 years. And he has followed me in every company I've worked for, SuperGen, and then Spectrum. When he retired from here, he became Scientific Advisor to the Company, and now he is on the Board of the Company."

185.    Obviously, Defendant Lenaz's professional success was largely dependent on

Defendant Shrotriya. Moreover, Defendant Lenaz's large Company stock holding, worth

approximately $1.67 million before the fraud was exposed, reveals his interest in keeping the

Company's stock price as high as possible. His insider transactions before the fraud was

exposed, which yielded $24,219 in proceeds, demonstrate his motive in facilitating and

participating in the fraud. As a trusted Company director, and a member of the Compensation

Committee, the Placement Committee, the Nominating and the Corporate Governance

Committee, and the Product Acquisition Committee, Defendant Lenaz conducted little, if any,

oversight of the Company's internal controls over public reporting of financial statements and of

the Company's engagement in the schemes described herein, consciously disregarded his duties

to monitor such controls over reporting and engagement in the schemes, and consciously

disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false

statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K and

the 2015 10-K. For these reasons, too, Defendant Lenaz breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him

is futile and, therefore, excused.

---

[6] *Fik v. Shrotriya et al*, No. 2:13-cv-00624-JAD-CWH (D. Nev.).

186.    Additional reasons that demand on Defendant Krassner is futile follow. Defendant Krassner has served as a director of Spectrum since 2004 and was previously a member of the Company's Scientific Advisory Board from 1996 to 2001. Thus, Defendant Krassner was a longtime Director of Spectrum and a longtime colleague of Defendant Shrotriya. Defendant Krassnen's large Company stock holding, worth approximately $2.3 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the fraud was exposed, which yielded $102,772 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As the Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee and the Compensation Committee, Defendant Krassner conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K and the 2015 10-K. Additionally, Defendant Krassner was aware that the Company had made a deplorable judgment in defying the FDA's guidance because he had extensive experience in scientific and regulatory advisory services, including FDA compliance. He cannot claim ignorance to the Company's misbehavior. He should have advised the Company to disclose and follow the FDA's guidance. For these reasons, too, Defendant Krassner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

Verified Shareholder Derivative Complaint

187.     Additional reasons that demand on Defendant Maida is futile follow. Defendant Maida has served as a director of Spectrum since 2003 and thus was a longtime Director of Spectrum and a longtime colleague of Defendant Shrotriya. Defendant Maida's large Company stock holding, worth approximately $1.9 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the fraud was exposed, which yielded $34,156 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As the Chair of the Audit Committee and a member of the Placement Committee, the Nominating and Corporate Governance Committee, and the Product Acquisition Committee, Defendant Maida conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K and the 2015 10-K. Additionally, Defendant Maida was aware that the Company's data from Studies 611 and 612 was insufficient to support the FDA's approval of the Apaziquone NDA because he had vast knowledge in the area of clinical development of oncology products, in addition to his continuous research in the field of oncology. He cannot claim ignorance to the Company's misbehavior and should have advised the Company to disclose and follow the FDA's guidance. For these reasons, too, Defendant Maida breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Cohen is futile follow.  Defendant Cohen has served as a director of Spectrum since June 2013. Defendant Cohen received the highest compensation among all the directors in 2015. Moreover, his large Company stock holding, worth approximately $456,420 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transactions before the fraud was exposed, which yielded $24,219 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As the Chair of the Compensation Committee and a member of the Audit Committee, the Placement Committee, and the Nominating and Corporate Governance Committee, Defendant Cohen conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K and the 2015 10-K. For these reasons, too, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.    Additional reasons that demand on Defendant Vyas is futile follow.  Defendant Vyas was a Company director since June 2013. Defendant Vyas has 31 years' tenure in oncology drug discovery research at Bristol-Myers Squibb Company, at which Defendant Shrotriya served 18 years and Defendant Lenaz served 22 years. Thus, Defendant Vyas lacks independence from either Defendant Shrotriya or Defendant Lenaz. Moreover, Defendant Vyas's large Company stock holding, worth approximately $496,321 before the fraud was exposed, reveals his interest

in keeping the Company's stock price as high as possible. His insider transactions before the fraud was exposed, which yielded $30,703 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, and a member of the Compensation Committee, the Nominating and Corporate Governance Committee, and the Product Acquisition Committee, Defendant Vyas conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In fact, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2014 10-K and the 2015 10-K. For these reasons, too, Defendant Vyas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.    Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

191.    Additionally, the demand in this case is excused because the Directors violated the Company's Corporate Governance Guidelines. Six of the seven Directors engaged in

egregious insider transactions while the stock price was inflated because of the false and misleading statements.

192.     Spectrum has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Spectrum any part of the damages Spectrum suffered and will continue to suffer thereby.  Thus, any demand on the Directors would be futile.

193.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

194.     The acts complained of herein constitute violations of fiduciary duties owed by Spectrum's officers and directors, and these acts are incapable of ratification.

195.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Spectrum.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter*

*alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Spectrum, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

196.    If there is no directors' and officers' liability insurance, then the Directors will not cause Spectrum to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

197.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(A) of the Securities Exchange Act of 1934

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

200.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

201.     Under the direction and watch of the Directors, the 2015 and 2016 Proxy Statements failed to disclose that: 1) both of the Company's 611 and 612 Studies did not meet the pre-specified criteria for superiority when compared to a placebo; 2) the FDA previously questioned whether the data from the Company's 611 and 612 Studies were clinically meaningful; 3) the Company's pooled analysis of the integrated data from these two studies was done post-hoc and was not part of the approved SAPs; and 4) the FDA advised the Company not to submit the NDA for Apaziquone based on data from the 611 and 612 Studies.

202.     The Individual Defendants also caused the 2015 and 2016 Proxy Statements to be false and misleading in that they stated that the Board leadership structure "facilitates the division of risk management oversight responsibilities and enhances the Board's effectiveness in fulfilling its oversight function" with respect to different areas of the Company's business risks and the Company's risk mitigation practices. Indeed, due to the Individual Defendants' conduct with respect to the intentional disregard of the FDA's guidance, and dissemination of the materially false and misleading statements, the Individual Defendants failed to practice and/or uphold sound corporate governance practices.

203.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2015 and 2016 Proxy Statements were materially false and misleading. The

misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2015 and 2016 Proxy Statements, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

204.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 and 2016 Proxy Statements.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

205.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Spectrum's business and affairs.

207.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

208.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Spectrum.

209.     In breach of their fiduciary duties, the Individual Defendants recklessly managed the Company by causing the Company to ignore and defy the FDA's guidance, which resulted in unnecessary expenses and damages to the Company.

210.     Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

211.    In further breach of their fiduciary duties owed to Spectrum, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and omissions of material fact.  The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

212.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Spectrum's securities and disguising insider transactions.

213.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Spectrum's securities and engaging in insider transactions.

214.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

215.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Spectrum has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216.    Plaintiff on behalf of Spectrum has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

217.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Spectrum.

219.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Spectrum that was tied to the performance or artificially inflated valuation of Spectrum, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

220.    Plaintiff, as a shareholder and a representative of Spectrum, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits–including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

221.    Plaintiff on behalf of Spectrum has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Spectrum, for which they are legally responsible.

224.    As a direct and proximate result of the Individual Defendants' abuse of control, Spectrum has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Spectrum has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

225.    Plaintiff on behalf of Spectrum has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

226.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Spectrum in a manner consistent with the operations of a publicly-held corporation.

228.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Spectrum has sustained and will continue to sustain significant damages.

229.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

230.    Plaintiff, on behalf of Spectrum, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

231.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Spectrum to waste valuable corporate assets by failing to disclose certain risks that impacted the Company's bottom line as alleged herein and by causing the Company to file an NDA based on inappropriate data and analysis, acting against the FDA's explicit guidance.

233.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

234.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

235.    Plaintiff on behalf of Spectrum has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Spectrum, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Spectrum;

(c)    Determining and awarding to Spectrum the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Spectrum and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Spectrum and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

> 2. a provision to permit the shareholders of Spectrum to nominate at least four candidates for election to the board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Spectrum restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and

proper.

Dated: February 23, 2017

Respectfully submitted,

**FARNAN LLP**

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
(516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*